**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

SEP - 9 2010

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal No. 3:10cr 257** |
| **v.** | ) | |
| | ) | **Count 1 - 18 U.S.C. § 1349** |
| **RUSSELL E. MACKERT,** | ) | **Conspiracy to Commit Mail Fraud** |
| | ) | |
| **Defendant.** | ) | **Count 2 - 31 U.S.C. § 5332** |
| | ) | **Bulk Cash Smuggling** |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY AND THE CHIEF OF THE UNITED STATES DEPARTMENT OF JUSTICE, FRAUD SECTION CHARGE THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Criminal Information:

#### The Conspirators

1.     Defendant RUSSELL E. MACKERT was an attorney residing in Houston, Texas who performed legal services for a number of businesses that were involved in acquiring life settlements, and marketing these life settlements to investors.  These business included, but were not limited to: A&O Resource Management, Ltd.; A&O Capital Management, LLC; Houston Tanglewood Partners, LLC; A&O Bonded Life Assets, LLC; A&O Bonded Life Assets Management, LLC; A&O Life Fund, LLC; A&O Life Fund Management, LLC; A&O Life Funds, LP; Life Fund 5.1, LLC; Life Fund 5.1 Management, LLC; Life Fund 5.2, LLC; Life Fund 5.2 Management, LLC;  AB Revocable Living Fund, LLC; and AB Revocable Living Fund Management, LLC (collectively referred herein as "the A&O Entities" or "A&O").

2. Christian M. Allmendinger was an individual residing in Houston, Texas who was a part owner of the A&O Entities. Allmendinger held the title of Vice-President of the A&O Entities and was active in the day-to-day management of the companies, as well as the marketing of A&O life settlement investment products to investors.

3. Adley H. Abdulwahab was an individual residing in Houston, Texas who owned and operated a company named Houston Investment Center ("HIC") that marketed A&O's life settlement investment products to investors. In addition, Abdulwahab eventually became a part owner in the A&O Entities and was active in the day-to-day management of the companies.

4. Brent P. Oncale was an individual residing in Houston, Texas who was a part owner of the A&O Entities. Oncale held the title of Vice-President of the A&O Entities and was active in the day-to-day management of the companies, as well as the marketing of A&O life settlement investment products to investors.

5. David White was an individual residing in Houston, Texas who eventually became the President of the A&O Entities.

6. Other conspirators, not named herein, included other executives, employees, and/or independent sales agents for the A&O Entities.

<u>Background of Life Settlements</u>

7. A life settlement is an investment in which a person, who is typically elderly or terminally ill, sells his life insurance policy for a cash payment, which is a percentage of the life insurance policy's face value or death benefit. The "face value" or "death benefit" is the amount of money paid by the insurance company when the insured dies. Life settlement companies typically purchase life insurance policies from insured individuals.

2

8.      Once the insured sells an insurance policy, the insured is no longer responsible for paying the policy's premiums and the life settlement company thereafter assumes responsibility for arranging the payment of any premiums.

9.      A policy is said to have "matured" when the insured individual dies and the insurance company is required to pay the death benefit to the designated parties, that is, the "beneficiaries." All premiums due prior to the death of the insured must be paid, in full and on a timely basis, to prevent additional cost or lapse. If an insurance policy lapses for any reason, such as failure to pay premiums, the policy's death benefit and any investment dependent on that benefit may be lost.

10.      Life settlement companies often sell fractionalized interests in life insurance policies as investments to individual investors. In such sales, investors are buying the right to receive a portion of the death benefit when the insured dies. The sale of fractional interests allows investors to invest smaller amounts of money, because each investor does not have to pay for the whole policy.

11.      Investors who purchase life settlements only realize a profit if the total amount invested in the policy, including the purchase price and any additional premium costs, is less than the amount of the death benefit. A life settlement is not profitable if the expenses of acquiring and maintaining the policy (including the amount of premiums that are paid) is more than the amount of the death benefit paid when the insured dies. Typically, the longer an insured lives, the less profitable the investment in that insured's life settlement would be.

12.      The period of time that the insured is predicted to live is called the "life expectancy." In the purchase and sale of life settlements, the assessment of an insured's life

3

expectancy is used to determine, among other things: (i) how much money needs to be set aside to pay future premiums; (ii) when the investor can expect to receive a payout on his or her investment; and (iii) the amount of profit the investor can expect to receive.

13.     The risk to the life settlement investor of the insured living past the calculated life expectancy – and thereby reducing the expected return on the investment – is often referred to in the industry as "maturity risk" or "longevity risk."

A&O's Bonded Life Settlements

14.     Beginning in or about November of 2004, Christian Allmendinger and Brent Oncale founded A&O Resource Management, the first of the A&O Entities, as equal partners. A&O obtained life settlements from a wholesale life settlement company, and began marketing and selling whole and fractionalized interests in those life settlements to investors. The A&O investments were commonly referred to as Bonded Life Settlements.

15.     A&O marketed Bonded Life Settlements directly to investors, but also soon began using Abdulwahab's marketing company, HIC, and independent sales agents to market the investments. Many of A&O's sales agents were insurance salesmen and most were not licensed to sell securities. A&O paid substantial commissions to HIC and independent sales agents, usually 10% of every Bonded Life Settlement investment, to incentivize HIC and the sales agents to make sales.

16.     A&O's Bonded Life Settlements were fixed maturity investments with a term of 4 to 7 years, depending on the length of investment chosen by the individual investors, which was purported to be based on the life expectancy of the insured on the underlying life insurance policy.

4

17.     A&O marketed the Bonded Life Settlements as providing a "guaranteed" minimum compounded annual rate of return, typically 10 to 12% depending on the amount of the initial investment, with the possibility of greater returns.

18.     The primary distinction between A&O's Bonded Life Settlement investment and typical life settlements was A&O's claim that it could guarantee the investment against longevity risk by obtaining a reinsurance bond from a third-party reinsurer.   A&O promised that if the insured lived beyond the investment term, then the reinsurance company would pay the investor the agreed-to minimum rate of return and assume ownership of the underlying insurance policy (as well as assume the obligation to pay future premiums).

19.     To support its claims of guaranteed returns, A&O, and its sales agents, informed investors that:

      a.    if the insured died before the investment term matured, then the A-rated insurance company that issued the underlying insurance policy – of which the investor was a beneficiary– would pay the investor; and

      b.    if the insured had not died at the end of the investment term, then the reinsurance company that issued the reinsurance bond would pay the guaranteed minimum rate of return.

20.     One of the primary risks of life settlement investments is the possibility that the underlying insurance policies will lapse for failure to pay premiums.  In that situation, the insurance company has no obligation to pay when the insured dies.  Because the reinsurance bonds obtained by A&O required that the underlying insurance policies be in full force and effect at the time of any claim, the reinsurance company also had no obligation to pay if the policies

5

lapsed for non-payment of premiums. Consequently, A&O investors risked losing their entire investments if the underlying insurance policies lapsed for non-payment of premiums.

21.     To assuage investors' potential concerns regarding the risk of the underlying insurance policies lapsing, A&O, and its sales agents, informed investors that A&O would use a portion of the investor funds to pay all future premiums due on the underlying insurance policies for the length of the investment period. Specific representations to investors regarding how the future premiums would be paid varied over time, but included:

   a.   that the premiums would be paid "up front," i.e. at the time of investors' initial investments;

   b.   that sufficient investor funds to cover future premiums would be maintained in an escrow account and paid over time; or

   c.   that sufficient investor funds to cover future premiums would be maintained by A&O in a premium reserve bank account and paid over time.

These representations led investors to believe that A&O set aside sufficient investor funds to pay premiums so that the underlying policies did not lapse, and that these funds were not commingled with A&O's general operating funds.

22.     A&O provided sales agents with instruction on the Bonded Life Settlement investment and tips on how to market it to investors. In addition, A&O created a website and marketing materials for its sales agents for distribution to potential investors. Those marketing materials were sent to sales agents and potential investors in the mail. A&O's website and marketing materials not only explained A&O's Bonded Life Settlement investment, but also included specific representations regarding A&O's management and past success.

23.    A&O's representations to investors in its website and marketing material included:

a.   In or about July of 2005, via A&O's website, that A&O was a privately held corporation headquartered in Houston with offices in San Antonio, San Francisco, and Los Angeles.

b.   In or about July of 2005, via A&O's website, that A&O had over 150 employees nationwide that included certified public accountants, insurance and securities attorneys, financial advisors, investment bankers, and economists.

c.   In or about April of 2006, via A&O's website, that A&O had a national staff of over 250 people that included certified public accountants, insurance and securities attorneys, financial advisors, investment bankers, and economists.

d.   In or about April of 2006, via A&O's website, that A&O's past efforts had enabled its clients to leverage $375 million into $800 million in less than 5 years with a compounded annual rate of return of 16.58%.

e.   In or about 2005 through 2007, via A&O's website and marketing literature, a flowchart of A&O's use of investor funds that depicted investor funds being deposited into an escrow account and then premium payments being made from the escrow account.

### A&O's Capital Appreciation Bonds

24.    In or about November of 2006, because Abdulwahab was responsible for a substantial portion of A&O's sales to investors, Allmendinger and Oncale invited Abdulwahab to become an equal owner in the A&O Entities.  Abdulwahab accepted the offer and Abdulwahab,

Allmendinger, and Oncale agreed that they would each share equally in the management and profits of A&O.

25.     By the late fall of 2006, various state securities and insurance regulators began scrutinizing A&O's investment offerings and making enquiries to A&O's management regarding those offerings. These regulators were concerned, among other things, that A&O's offerings were unregistered securities.

26.     In response, in part, to increasing regulatory scrutiny from state securities and insurance regulators, Allmendinger, Abdulwahab, and Oncale agreed that A&O would establish hedge funds to sell securities backed by life settlements, which would be sold to individual investors. To assist them in establishing the hedge funds, A&O consulted with legal counsel – Law Firm A – to advise it regarding the sale of securities. At a meeting attended by Allmendinger, Abdulwahab, and Oncale in or about November of 2006, Law Firm A informed A&O that due to the legal restrictions on the sale of these unregistered securities: (i) Abdulwahab, as a fund manager, could sell the securities to his pre-existing clients but could not solicit sales of the securities to new clients; (ii) Allmendinger and Oncale could not sell the securities because they were not fund managers; and (iii) other than fund managers, the only other individuals authorized to sell A&O's securities were registered representatives of broker dealers with appropriate securities licenses.

27.     In or about January of 2007, A&O began offering investments referred to as Capital Appreciation Bonds, which were securities that were general obligations of the company and were securitized by a portfolio of life settlements. A&O promised investors a minimum rate of return backed by a pool of underlying life insurance policies.

8

28.     In or about January of 2007, A&O no longer offered the Bonded Life Settlement investment in which investors were assigned fractionalized or whole ownership interests in specific life insurance policies.

29.     A&O informed its independent sales agents, most of whom were not licensed to sell securities, that the agents really were selling the very same investment because the Capital Appreciation Bonds had a fixed investment term with a guaranteed minimum rate of return, and the underlying pool of life insurance policies continued to have the additional security of reinsurance bonds from the third-party reinsurer.

30.     A&O continued to pay its independent sales agents substantial commissions, usually 10% of every Capital Appreciation Bond investment, to incentivize the agents to sell its new investment product.

31.     To facilitate the sales of its Capital Appreciation Bonds, A&O also continued creating marketing materials for its sales agents to distribute to potential investors. For example, in a sales insert entitled "A&O History," A&O claimed that it had offices in Houston, Chicago, Wilmington, Glendale, and Ft. Lauderdale. In that same insert, A&O claimed that its efforts had enabled its clients to leverage $579 million into $1.2 billion in less than 5 years.

32.     In addition to the marketing material, A&O also gave its sales agents Private Offering Memoranda ("POM") to provide to investors who wanted to invest in A&O's Capital Appreciation Bonds. A&O's POM informed investors that 95% of investor funds received by A&O would be invested by A&O to purchase and maintain a portfolio of life settlements.

### The "Sale" of A&O

33.     By the summer of 2007, various state and securities regulators increasingly scrutinized A&O investment offerings.  A&O retained outside legal counsel – Law Firm B – to advise it regarding, as well as respond to, numerous state regulatory enquiries that A&O had received.  As part of its legal representation of A&O, Law Firm B informed Allmendinger, Abdulwahab, and Oncale that A&O could not continue to sell its securities through its independent sales agents who were not licensed to sell securities.

34.     In or about August of 2007, motivated, in part, by their desire to avoid the increasing regulatory scrutiny of their individual involvement in the A&O investment offerings, Allmendinger, Abdulwahab, and Oncale decided to sell the A&O Entities.

35.     Unbeknownst to Allmendinger, Abdulwahab and Oncale enlisted the assistance of attorney RUSSELL E. MACKERT, who had previously performed legal services for A&O, to create a sham sales transaction whereby the A&O Entities would be "sold" to an offshore entity named Blue Dymond Capital Group, LLC, ("Blue Dymond") located in Nevis.

36.     Blue Dymond was secretly owned and controlled by Abdulwahab and Oncale. The purpose of the sham sales transaction was twofold.  First, it would allow Abdulwahab and Oncale to eliminate Allmendinger as their partner in the A&O Entities.  Second, it would allow Abdulwahab and Oncale limiting their individual exposure to the ongoing regulatory scrutiny as they could claim that they no longer owned A&O.

37.     On or about August 31, 2007, Allmendinger, Abdulwahab, and Oncale signed the sale agreement in which they agreed to sell the A&O Entities to Blue Dymond.

38.     In consultation with Abdulwahab and Oncale, MACKERT actively facilitated the

10

sham sales transaction to Blue Dymond by: (i) finding and secretly purchasing the Nevis-based Blue Dymond, which was merely a shell corporate entity; (ii) creating a fictional person named "RJ Stephenson" to serve as Blue Dymond's purported representative; (iii) having someone sign RJ Stephenson's signature on behalf of Blue Dymond on the sales contract; (iv) allowing Abdulwahab and Oncale to secretly deposit funds into MACKERT's trust account that MACKERT then used to pay Allmendinger his portion of the sales price; and (v) hiring an actor to pretend to perform due diligence on behalf of Blue Dymond for the sham sales transaction.

39.     Soon after the sham sales transaction to Blue Dymond, Abdulwahab, Oncale, and MACKERT created a another shell company to "purchase" Blue Dymond. MACKERT set up a second Nevis-based shell corporate entity named Physician's Trust, LLC ("Physician's Trust") and the A&O entities were purportedly acquired by Physician's Trust.

40.     Physician's Trust was secretly owned and controlled by Abdulwahab and Oncale. The effect of this second sham transaction – for which no sale contract was actually executed – was that Abdulwahab and Oncale were further insulated from regulatory scrutiny.

41.     In or about September of 2007, Abdulwahab and Oncale, on behalf of Physicians Trust, hired yet another law firm – Law Firm C – to provide legal advice regarding the regulatory enquiries that A&O had received from various state regulators.

42.     In or about September of 2007, Abdulwahab and Oncale, despite purportedly having no ownership role in the A&O Entities, arranged for David White to become the "figurehead" President of A&O. White was portrayed to regulators, Law Firm C, investors, and others as having responsibility for the management of the A&O Entities. In actuality,

11

Abdulwahab and Oncale continued to manage and control A&O, with MACKERT's guidance and advice.

43.      In or about September of 2007, Abdulwahab, Oncale, and White met with attorneys from Law Firm C to discuss state regulatory enquiries of A&O's investment offerings. At the meeting, the attorneys informed Abdulwahab, Oncale, and White that A&O was legally prohibited from continuing to sell unregistered securities.  In addition, the attorneys told Abdulwahab, Oncale, and White that there was potential individual civil and criminal liability if A&O ignored Law Firm C's legal advice.  White subsequently led Law Firm C to believe that A&O had heeded the legal advice and had ceased its investment sales.

44.      In the fall of 2007, Law Firm C responded to various state regulatory enquiries into A&O's investment offerings.  Among the regulators' concerns were: (i) the fact that Abdulwahab had pleaded guilty to two felony forgery offenses in 2004, which had not been disclosed to A&O's investors; (ii) the regulators inability to determine who currently owned and operated the A&O Entities; and (iii) questions regarding A&O's ability to continue to make premium payments on the underlying insurance policies to ensure that the policies did not lapse.

45.      In response to the regulators' concerns and based on information provided by Abdulwahab, Oncale, and White, Law Firm C told regulators that: (i) Abdulwahab was no longer an owner or manager of the A&O Entities; (iii) Abdulwahab, Allmendinger, and Oncale ceased having ownership and control of A&O at the time of the sale of A&O on August 31, 2007; (iii) A&O had sufficient funds in premium reserve bank accounts to pay the premium payments on the underlying insurance policies for the term of the investments; and (iv) that A&O had ceased its sales of investment products.

46.     A&O stopped accepting investor funds in or about January of 2008.

47.     Despite Law Firm C's assurances, state regulators continued to investigate A&O's investment offerings.  In or about February of 2008, White was interviewed by state securities regulators regarding A&O.  In response to questions regarding the adequacy of A&O's funds to pay premiums and the current ownership of the A&O Entities, White stated that: (i) A&O had more than sufficient funds to pay premiums in its premium reserve accounts; (ii) RJ Stephenson was the principal of Physicians Trust, which owned the A&O Entities; and (iii) White had personally spoken with RJ Stephenson on the phone.

48.     Following White's meeting with regulators, A&O transferred approximately $4.6 million into third-party escrow accounts.  This money was purportedly for the payment of premiums on the underlying insurance polies to ensure that the policies did not lapse.  Soon thereafter, White's role as the "figurehead" President of the A&O Entities ended.

49.     In or about March of 2008, a company owned and controlled by MACKERT entered into a management agreement with Physicians Trust.  In that agreement, MACKERT agreed to monitor the premium payments on the underlying insurance agreements for the A&O Entities and work with an accounting firm to deliver an annual letter to investors.  The management agreement was purportedly signed by RJ Stephenson on behalf of Physicians Trust.

50.     MACKERT subsequently hired an accounting firm to prepare audit letters that were sent to investors by the accounting firm.  MACKERT informed the accounting firm that: (i) there were sufficient funds in the escrow accounts to pay all future premium payments for the duration of the investments; (ii) the escrow funds were deposited with the escrow agent as part of the sale of the A&O Entities; (iii) the current owners asked the prior owners to determine the

13

necessary amount to pay all of the future required premium payments; and (iv) this determination was the basis for the funds deposited into escrow.

51.     In or about June of 2008 through in or about December of 2008, pursuant to Mackert's management agreement, the accounting firm  prepared letters containing MACKERT's representations regarding the genesis and sufficiency of the escrow accounts that were subsequently mailed to investors.  The purpose of these letters was to reassure investors about the safety and security of their investments in A&O's products.

52.     On or about September 2, 2009, due to A&O's inability to pay premiums on the underlying life insurance products, MACKERT placed the majority of A&O Entities into Chapter 11 bankruptcy.

53.     Due to A&O's marketing efforts, and the representations contained in its marketing materials and made by its independent sales agents, A&O obtained approximately $100 million in investor funds from more than 800 investors.  These investors were located in approximately 37 different states, including Virginia, and in Canada.

## COUNT ONE

(Conspiracy to Commit Mail Fraud)

### THE CONSPIRACY

54.     The allegations set forth in paragraphs 1 through 53 of the Information are realleged and incorporated as though set forth in full herein.

55.     From in or about August of 2007 through the present, within the Eastern District of Virginia and elsewhere, defendant

## RUSSELL E. MACKERT

did unlawfully and knowingly combine, conspire, confederate, and agree with others, both known and unknown, to commit an offense against the United States, namely having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, did knowingly: (a) place and cause to be placed in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service; (b) deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and interstate commercial carrier; and (c) cause to be delivered by mail and private and interstate commercial carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code, Section 1341.

### PURPOSE

56.     A purpose of the conspiracy was to mislead investors regarding A&O's safekeeping and use of investor funds and the risks of A&O's investment offerings in order to

obtain investor funds so that the conspirators could profit personally and fund their lavish lifestyles.

## MANNER AND MEANS

57.     Allmendinger, Abdulwahab, MACKERT, and their co-conspirators made, and caused to be made, numerous material misrepresentations and omissions designed to mislead investors regarding A&O, the risks of A&O's investment offerings, and A&O's safekeeping and use of investor funds.

58.     Based on material misrepresentations and omissions by Allmendinger, Abdulwahab, and their co-conspirators, A&O's investors were led to believe that A&O had a proven track record of investment success in life settlements.  For example, while A&O was offering Bonded Life Settlements, investors were told that A&O's past efforts had enabled its clients to leverage $375 million into $800 million in less than 5 years with a compounded annual rate of return of 16.58%.  In addition, while A&O was offering Capital Appreciation Bonds, investors were told that A&O's past efforts had enabled its clients to leverage $579 million into $1.2 billion in less than 5 years.  In truth and fact, virtually none of A&O's investors made any money on their A&O life settlement investments because only one relatively small underlying life insurance policy matured during A&O's investment offerings.

59.     Based on material misrepresentations and omissions by Allmendinger, Abdulwahab, and their co-conspirators, A&O's investors were led to believe that A&O was a large investment company that had office locations in multiple states.  For example, in A&O's sales insert entitled "A&O History," A&O claimed that it had offices in Houston, Chicago,

Wilmington, Glendale, and Ft. Lauderdale. In truth and fact, A&O only had one office location, which was in Houston, Texas.

60.     Based on material misrepresentations and omissions by Allmendinger, Abdulwahab, and their co-conspirators, A&O's investors were led to believe that A&O had a large staff of professionals. For example, A&O claimed on its website at various times that it had over 150 employees nationwide that included certified public accountants, insurance and securities attorneys, financial advisors, investment bankers, and economists. In truth and fact, A&O never had more than four employees, and these employees  provided secretarial and administrative support, rather than professional services.

61.     Based on material misrepresentations and omissions by Allmendinger, Abdulwahab, and their co-conspirators, A&O's investors were led to believe that their money would be deposited into escrow accounts that would be utilized for the purchase of life settlements, the purchase of reinsurance bonds, and the payment of future premiums due for the underlying life insurance policies. In truth and fact, the escrow accounts were never utilized for any of these purposes and had no practical business purpose other than reassuring A&O's investors regarding the safety and legitimacy of their investments. The escrow accounts were merely pass-throughs and all A&O investor funds ultimately were commingled into A&O's bank accounts, over which Allmendinger, Abdulwahab, and other co-conspirators had control.

62.     Based on material misrepresentations and omissions by Allmendinger, Abdulwahab, and their co-conspirators, A&O's investors were led to believe that a portion of their investment would be set aside and utilized to pay all future premiums due for the underlying insurance policies for the term of their investments either up-front, from an escrow account, or

17

from a premium reserve account. In truth and fact, A&O did not set aside a portion of investor funds to pay the necessary future premiums. Instead, A&O commingled investor monies with its general operating funds, and Allmendinger, Abdulwahab, and their co-conspirators routinely used these funds for their personal enrichment. The conspirators' personal use of investor funds resulted in A&O using new A&O investor monies to pay premiums associated with life settlements pledged to earlier A&O investors.

63.    Based on material misrepresentations and omissions by Allmendinger, Abdulwahab, and their co-conspirators, A&O's investors were led to believe that A&O's investment offerings were guaranteed and had little to no risk. For example, in an A&O recorded sales presentation, when asked whether there was any way that an A&O client could lose money, Allmendinger and another co-conspirator stated that the main risk of the A&O investment was that the A+ rated life insurance company that issued the insurance policy would default. In truth and fact, due to the conspirators' personal use of investor funds, one of the primary risks of the A&O investments was that the underlying life insurance policies would lapse for non-payment of premiums.

64.    Based on material misrepresentations and omissions by Allmendinger, Abdulwahab, and their co-conspirators contained in A&O's POM, investors in A&O's Capital Appreciation Bonds were led to believe that 95% of investor funds received by A&O would be invested by A&O in purchasing and maintaining a portfolio of life settlements. In truth and fact, it was impossible for A&O to invest 95% of investor funds as described in the POM because Allmendinger, Abdulwahab, and their co-conspirators were paying sales agents commissions of approximately 10% for every sale. In addition, Allmendinger, Abdulwahab, and their co-

18

conspirators failed to inform A&O Capital Appreciation Bond investors that the majority of investor money was utilized by the conspirators for purposes wholly unrelated to purchasing and maintaining portfolios of life settlements.

65.     In addition to the above material misrepresentations and omissions to investors during A&O's investment offerings, part of the manner and means of the conspirators' scheme to defraud consisted of deceiving investors by reassuring them about the safety of their investments after A&O had ceased selling its investment offerings in order to avoid detection of the scheme.

66.     Based on material misrepresentations and omissions by MACKERT – with Abdulwahab's knowledge and approval – investors were led to believe that funds to pay all future premiums for the term of their investment had been placed in escrow as part of the sale of A&O. In truth and fact, A&O did not place funds into escrow at the time of the sham sales transaction and only did so six months after the sale.

67.     Based on material misrepresentations and omissions by MACKERT and other conspirators, investors were led to believe that the sale of A&O had resulted in Abdulwahab and Oncale no longer having ownership or control over the A&O Entities. In truth and fact, Abdulwahab and Oncale continued to own and operate the A&O Entities after the sham sales transaction.

68.     In addition to the above material misrepresentations and omissions to investors, part of the manner and means consisted of misleading A&O's outside counsel and state regulators regarding A&O's investment offerings in order to continue taking in new investor monies and to avoid detection of the scheme.

69.     Based on material misrepresentations and omissions by Abdulwahab, Law Firm A was led to believe that Abdulwahab had never been charged with a felony or misdemeanor involving fraud, wrongful taking of property, or forgery. In truth and fact, Abdulwahab had been charged with forgery of a commercial financial instrument in Texas in 2004.

70.     Based on material misrepresentations and omissions by Abdulwahab, Law Firm A was led to believe that A&O was not paying commissions for sales of Capital Appreciation Bonds to individuals that lacked the appropriate licenses to sell securities. In truth and fact, A&O routinely paid sales agents, who lacked the appropriate licenses, commissions to sell A&O's Capital Appreciation Bonds. In addition, A&O misled these sales agents by telling them that they did not need licenses to sell Capital Appreciation Bonds.

71.     Based on material misrepresentations and omissions by Allmendinger, Law Firm B was led to believe that only individuals with the appropriate licenses to sell securities were selling A&O's Capital Appreciation Bonds. In truth and fact, A&O routinely used sales agents who lacked the appropriate licenses to sell A&O's Capital Appreciation Bonds.

72.     Based on material misrepresentations and omissions by Allmendinger, Law Firm B was led to believe that premiums for the underlying life insurance policies were either paid up-front or were paid from a designated premium reserve account for the term of the investment. In truth and fact, A&O commingled investor monies with its general operating funds, and Allmendinger, Abdulwahab, and their co-conspirators routinely used these funds for their personal enrichment.

73.     Based on material misrepresentations and omissions contained in an affidavit filed by Abdulwahab, state securities regulators were led to believe that A&O sold its investments

either through Abdulwahab's personal contacts or through individuals with the appropriate licenses, and that A&O did not pay commissions to non-licensed sales representatives for the sale of its securities offerings.  In truth and fact, A&O routinely paid sales agents, who lacked the appropriate licenses, commissions to sell A&O's Capital Appreciation Bonds.

74.     Based on material misrepresentations and omissions by Abdulwahab and other conspirators, Law Firm C and state regulators were led to believe that Abdulwahab and Oncale had no ownership or management role in the A&O Entities after the "sale" of A&O to Blue Dymond and Physicians Trust.  In truth and fact, Abdulwahab and Oncale continued to own and operate the A&O Entities after the sham sales transaction.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Bulk Cash Smuggling)

75.     The allegations contained in paragraphs 1 through 74 of this Information are realleged and incorporated as though set forth in full herein.

76.     On or about January 6, 2008, in the Eastern District of Virginia, and elsewhere, defendant,

### RUSSELL E. MACKERT

with the intent to evade a currency reporting requirement under Title 31, United States Code, Section 5316, knowingly caused the concealment of more than $10,000 in currency and other monetary instruments on the person of such individual, and caused the transport and transfer or the attempted transport and transfer of such currency and monetary instruments from a place within the United States to a place outside of the United States.

77.     On or about January 4, 2008, MACKERT purchased two cashiers checks for $5 million apiece from funds previously deposited into MACKERT's attorney trust (IOLTA) account, which represented part of Abdulwahab and Oncale's proceeds from the A&O scheme to defraud investors.  The cashiers checks were made out to two companies owned and controlled by Abdulwahab and Oncale.

78.     On or about January 6, 2008, MACKERT, Abdulwahab, and Oncale traveled to Ft. Lauderdale, Florida.  While in an airport in Ft. Lauderdale, MACKERT observed a sign warning of the legal requirement to declare currency and financial instruments in excess of $10,000 when traveling overseas.  MACKERT had the $10 million worth of cashiers checks on his person.

22

79.     On or about January 6, 2008, despite knowing the legal declaration requirement and the fact that he had in excess of $10,000 in monetary instruments secreted on his person, MACKERT traveled – with Abdulwahab and Oncale – from Ft. Lauderdale, Florida to the Federation of Saint Kitts and Nevis for the purpose of depositing Abdulwahab and Oncale's ill-gotten gains in overseas bank accounts.

(All in violation of Title 31, United States Code, Section 5332, and Title 18, United States Code, Section 2.)

23

## Forfeiture Allegation

Pursuant to Federal Rule of Criminal Procedure 32.2, the defendant is advised that upon conviction of the offense charged in Count One of this information, he shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violation charged in Count One.  As to Count Two, defendant shall forfeit any property involved in the offense.

If property subject to forfeiture meets the requirements of 21 U.S.C. § 853(p), the government will seek an order forfeiting substitute assets.

(In accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(C) and 31 U.S.C. § 5332(b)(2)).


NEIL H. MACBRIDE
UNITED STATES ATTORNEY

DENIS J. MCINERNEY
CHIEF, FRAUD SECTION


By: _____

Michael Dry
Jessica Brumberg
Assistant United States Attorneys
Eastern District of Virginia

By: _____
for Albert Stieglitz
Trial Attorney, Fraud Section
Department of Justice


24